UNITED STATES OF AMERICA

DISTRICT OF CONNECTICUT

3:16mj437-JGM

UNITED STATES OF AMERICA       :
                               :
                               :   ss: New Haven, Connecticut
                               :
COUNTY OF NEW HAVEN            :

## AFFIDAVIT

1.  William P. Ready, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation ("FBI") for the past twenty-eight years including health care fraud matters the past three years, and charges as follows:

2.  That from at least in or about September of 2012 up to and including in or about December of 2015, in the District of Connecticut and elsewhere, JEFFREY PEARLMAN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B).

3.  That it was a part and object of the conspiracy that the defendant, and others known and unknown, unlawfully, willfully, and knowingly would and did offer and pay remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering a good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B). This affidavit is submitted in support of a criminal complaint charging JEFFREY PEARLMAN with a violation of Title 42, United

States Code, Section 1320a-7b(b)(2)(B).

The basis for my knowledge and the foregoing charges is, in part, as follows:

4.  I am a Special Agent with the FBI and I have been personally involved in the investigation of this matter. This affidavit is based in part upon my conversations with law enforcement agents and witnesses, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**PHARMACEUTICAL COMPANY-1**

5.  That at all times relevant, Pharmaceutical Company-1 ("PC-1") manufactured and sold a fentanyl-based sublingual spray ("fentanyl spray"). That fentanyl is a synthetic opioid that is classified as a Schedule II controlled substance under the Controlled Substances Act and is primarily utilized as a pain relief medication because it is approximately 100 times more potent than morphine as an analgesic.

6.  That fentanyl can serve as a direct substitute for heroin in opioid-dependent individuals, but that it is a dangerous substitute for heroin because it is much more potent.

7.  That in or about January 2012, the FDA approved the fentanyl spray manufactured by PC-1 solely for "the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain."

2



8.      That the defendant was employed by pharmaceutical company-1 (PC-1) from approximately September 2012 until December 2015.

9.      That PC-1 first hired the defendant as a sales representative and in February of 2013, promoted him to the position of District Sales Manager (DSM). That at certain points in his career, the defendant was responsible for managing PC-1's sales representatives in, among other states, Connecticut, New York, New Jersey and Rhode Island.

10.     That as part of his duties as a DSM, the defendant managed a team of sales representatives who called on licensed health care providers, including physicians, advanced practice registered nurses (APRNs) and physicians' assistants in order to get them to prescribe PC-1's fentanyl spray.

**OVERVIEW OF THE SPEAKER PROGRAM KICKBACK SCHEME**

11.     That one way that the defendant and the sales representatives he managed induced health care professionals to prescribe PC-1's fentanyl spray was to pay these licensed health care providers to participate in Speaker Programs. These Speaker Programs were ostensibly designed to gather licensed health care professionals who had the capacity to prescribe this fentanyl spray and educate them about the drug.

12.     That in this regard, PC-1 paid their speakers a flat fee per Speaker Program that ranged from $1,000 to several thousand dollars and that these Speaker Programs were held at high-end restaurants throughout the defendant's territories, including at places like Carmen Anthony's in New Haven, Connecticut. That in addition to paying for the speaker's fee, PC-1 paid for all the dinner program attendees' meals and alcoholic drinks as well.



13. That instead of using the speaker programs as educational events, the defendant, the sales representatives that he supervised, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 42, United States Code, Section 1320a- 7b(b)(2)(B) by offering or paying remuneration (through kickback payments), directly or indirectly, overtly or covertly, in cash or in kind, to physicians, APRNs or physician assistants to induce them to prescribe the PC-1's fentanyl spray.

14. That the Speaker Programs were largely sham events that were usually just a gathering of friends and co-workers where no educational component took place and no one with the ability to prescribe PC-1's fentanyl spray attended and yet the defendant still authorized PC-1 to pay the health care provider in order to induce the provider to prescribe more of PC-1's fentanyl spray.

15. That many of the Speaker Programs that were organized by the defendant's subordinates once he became a District Manager lacked an appropriate audience of healthcare professionals and that the sign-in sheets for such Speaker Programs were at times forged with defendant's knowledge so as to make it appear that the Speaker Programs had an appropriate audience of healthcare professionals when, in truth and fact, they did not.

16. That PC-1 paid cooperating witness-1 (CW-1)[1], a health care provider with offices in Connecticut, $1,000 per speaking engagement. That based on statements made by CW-1 and a review of the payments PC-1 made to CW-1, PC-1 paid CW-1 approximately $83,000 in illegal remuneration for conducting sham Speaker Programs to induce CW-1 to prescribe PC-1's

---

[1] CW-1 is assisting the Government's investigation in the hopes of obtaining leniency at sentencing in connection with CW-1's conduct. Information provided by CW-1 has been corroborated by other evidence, including, but not limited to, sign-in sheets from Speaker Programs, email and text message communications obtained during the course of this investigation, and witness interviews.

fentanyl spray.

17. That the fentanyl spray prescriptions that were written as a result of these unlawful payments to CW-1 were paid for by Federal health care programs including Medicare, Medicaid and other private health care programs.

18. That based on statements made by CW-1 to myself and others involved in the investigation, the payments for the sham Speaking Engagements by PC-1 did induce CW-1 to increase CW-1's prescribing of PC-1's fentanyl spray; that CW-1 preferred PC-1's fentanyl spray over other similar fentanyl products because CW-1 was paid more by PC-1 for speaking engagements than by other pharmaceutical companies; and that CW-1 encouraged co-workers to prescribe PC-1's fentanyl spray over similar medications because of the payments CW-1 received from PC-1 for the sham Speaker Programs.

19. That the defendant and the sales representatives he managed, used hundreds of speaker programs throughout Connecticut, New York, New Jersey and Rhode Island as a reward to induce health care providers to prescribe more and more of PC-1's fentanyl spray.

## OVERT ACTS

20. In furtherance of this conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the District of Connecticut and elsewhere:

   a. That in or around the spring of 2013 at a meeting between the defendant, CW-1 and cooperating witness-2 (CW-2)[2] at CW-1's office in Connecticut the defendant told CW-1 that if CW-1 wrote one of PC-1's fentanyl spray prescriptions per week then he would give the CW-1 more speaking programs as a reward. That the purpose of awarding CW-1 more Speaker

---

[2] CW-2 is assisting the Government's investigation in exchange for not being charged in connection with CW-2's conduct while employed at PC-1. Information provided by CW-2 has been corroborated by other evidence, including, but not limited to, sign-in sheets from Speaker Programs, email and text message communications obtained during the course of this investigation, and interviews with other former employees of PC-1.

5

Programs was simply to pay CW-1 a kickback in exchange for CW-1 prescribing more of PC-1's fentanyl spray.

b. That in the Spring of 2013, the defendant sent CW-2 an email titled "alarming." That in this email the defendant explained that he needed to share an "alarming stat" with CW-2 for the first quarter of 2013. That the defendant advised CW-2 that "if [CW-1] is not pulling thru the "1 new patient/week" it clearly is not going to result in the income we want to see." That I believe that the reference to "income" refers to the amount of the quarterly bonuses that could be realized by both the defendant and CW-2 if CW-1 were to prescribe PC-1's fentanyl spray to one new patient a week.

c. That thereafter, in June of 2013, when these prescriptions were not initially being written as discussed, the defendant emailed CW-2, the PC-1's sales representative who was responsible for calling on CW-1, and stated, "[v]ery simply when I look at return on investment as [CW-1] has not motivated any new prescribers as of yet and [CW-1] is not significantly increasing [CW-1's] own business, I am going to have tremendous difficulty in justifying more programs."

d. That the defendant attended a sham Speaker Program at Carmen Anthony's restaurant in New Haven, Connecticut on or about June 18, 2013 and that CW-1 and CW-2 were present for this dinner. Rather than have an educational meeting about PC-1's fentanyl spray, CW-1 did not give any presentation about it at all and there were no attendees other than the defendant, CW-1 and CW-2. That during this dinner, when CW-1 pressed the defendant about the propriety of paying CW-1 for a Speaker Program that CW-1 did not conduct, the defendant responded with words to the effect of, "Don't worry about the dinners. Let [CW-2] worry about the dinners. You just worry about writing scripts [for PC-1's fentanyl spray]." That the



defendant authorized payment to CW-1 for conducting this sham Speaker Program in order to induce CW-1 to prescribe PC-1's fentanyl spray. That on June 27, 2013, the defendant responded to an email originally sent by the individual at PC-1 who was responsible for tracking prescriptions written of PC-1's fentanyl spray on a daily, weekly and monthly basis. That the defendant responded with, "That's right, 5 from [CW-1] today" referring to the number of fentanyl spray prescriptions CW-1 had written the previous day, approximately nine days after conducting the June 18, 2013 sham Speaker Program with the defendant.

22. That the defendant perpetrated this unlawful *quid pro quo* conduct in Connecticut, New York, New Jersey and Rhode Island throughout the course of his employment at PC-1, causing millions of dollars of losses to Federal health care programs. For example, as a result of the unlawful remuneration paid *only* to CW-1 in Connecticut through the sham Speaker Programs, the defendant caused a loss to the Medicare program alone of at least $1.3 million.

**PEARLMAN'S COMPENSATION AND PROMOTION**

23. That based on my review of documents obtained during the course of this investigation relating to the compensation of PC-1's sales force, I have learned, among other things that the defendant received quarterly bonuses that were based on PC-1's incentive-based compensation system. Under this incentive-based compensation system, PEARLMAN and other District Managers received a bonus based in large part on the sales results of the sales representatives that were assigned to their respective sales territories. By way of example, PEARLMAN received a bonus of over $95,000 in the third quarter of 2013. This incentive-based compensation system allowed PEARLMAN to personally profit significantly from this illegal conspiracy to provide kickbacks in the form of payments to health care providers for conducting sham Speaker Programs.



## CONCLUSION

24.     I submit that this affidavit supports probable cause to believe that between September 2012 and December 2015 JEFFREY PEARLMAN and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B). As a result, I request that the attached complaint and arrest warrant issue.

William P. Ready
Special Agent, FBI

Subscribed and sworn to before me this 23rd day of September, 2016

/s/ Joan G. Margolis, USMJ
JOAN G. MARGOLIS
UNITED STATES MAGISTRATE JUDGE

